UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Socket Solutions, LLC )
)
)
Plaintiff, )
v. )
)
Import Global, LLC )
)
)
Defendant. )
)

Case No. 1:23-cv-24517-RAR

Civil Action

**MOTION FOR PRELIMINARY INJUNCTION AND
INCORPORATED MEMORANDUM OF LAW IN SUPPORT
<u>OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION</u>**

## TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................................ 1

II.   FACT BACKGROUND ............................................................................................. 3

  A.   The Sleek Socket® Products ................................................................................ 3

  B.   The '080 Patent .................................................................................................... 4

  C.   The Claimed Invention ........................................................................................ 6

  D.   The Accused Product ........................................................................................... 7

  E.   Scope of Requested Preliminary Injunction ..................................................... 12

  F.   Legal Standard for Preliminary Injunction ...................................................... 12

    1.   Socket Solutions Is Likely to Succeed on the Merits. ................................. 13

      a)   The Accused Product Infringes Claim 19. ............................................ 13

        (1)   Claim Construction Principles ........................................................ 13

        (2)   The Accused Product Meets Each Claim Limitation. ..................... 14

          (a)   Claim Preamble ......................................................................... 14

          (c)   Proximal End of Cord ................................................................ 19

          (d)   Distal End of Cord ..................................................................... 20

          (e)   Pin Requirement ........................................................................ 21

      b)   Socket Solutions Is Unaware of any Invalidity Arguments. ................. 21

    2.   Global's Infringement Is Causing Irreparable Harm. ................................. 23

      a)   Lost Sales and Lost Market Share. ........................................................ 23

      b)   Harm to Reputation and Goodwill. ....................................................... 23

      c)   Lost Benefit of the Patent. .................................................................... 28

      d)   Lost Management Time Is Non-Compensable Harm. ........................... 29

    3.   The Balance of Hardships Favors Socket Solutions .................................... 29

    4.   Public Interest Favors Socket Solutions ..................................................... 31

III.  CONCLUSION ........................................................................................................ 31

# TABLE OF AUTHORITIES

Cases

*Aevoe Corp. v. AE Tech Co.*, 727 F.3d 1375 (Fed. Cir. 2013) ..................................................... 12

*Alloc, Inc. v. ITC*, 342 F.3d 1361 (Fed Cir. 2003) ........................................................ 14

*Aria Diagnostics, Inc. v. Sequenom, Inc.*, 726 F.3d 1296 (Fed. Cir. 2013) ................................. 23

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801 Fed. Cir. 2002) ..................... 15

*Celsis* In *Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922 (Fed. Cir. 2012) ................................ 23, 30

*CIAS, Inc. v. All. Gaming Corp.*, 504 F.3d 1356 (Fed. Cir. 2007) ............................................... 16

*Cole v. Kimberly-Clark Corp.*, 102 F.3d 524 (Fed. Cir. 1996) ..................................................... 13

*Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336
(Fed. Cir. 2013) ........................................................................................................... 23, 24, 28, 31

*Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 149 F.3d 1309 (Fed. Cir. 1998) ................. 13

*H.H. Robertson, Co. v. United Steel Deck, Inc.*, 820 F.2d 384 (Fed. Cir. 1987) ......................... 30

*Hybritech Inc. v. Abbott Laboratories*, 849 F.2d 1446 (Fed. Cir. 1988) ............................... 30, 31

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995)
(en banc), aff'd on other grounds, 517 U.S. 370 ......................................................... 13

*Mikohn Gaming Corp. v. Acres Gaming, Inc.*, 165 F.3d 891 (Fed. Cir. 1998) .......................... 12

*Nautilus, Inc. v. Biosig Instruments, Inc.*, 52 U.S. 898 (2014) ...................................................... 22

*PPG Indus., Inc. v. Guardian Indus. Corp.*, 75 F.3d 1558 (Fed. Cir. 1996) ............................... 31

*Reebok Int'l Ltd. v. J. Baker, Inc.*, 32 F.3d 1552 (Fed. Cir. 1994) ......................................... 28, 30

*Revision Military, Inc*. v. Balboa Mfg. Co., 700 F.3d 524 (Fed. Cir. 2012) ............................... 13

*Robert Bosch, LLC v. Pylon Mfg. Corp.*, 659 F.3d 1147 (Fed. Cir. 2011) .................................. 28

*Schiavo ex. rel Schindler v. Schiavo*, 403 F.3d 1223 (11th Cir. 2005) ........................................ 13

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
242 F.3d 1337 (Fed. Cir. 2001)........................................................................................ 14

*Symbol Technologies, Inc. v. Opticon, Inc.*, 935 F.2d 1569 (Fed. Cir. 1991)............................. 21

*Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372 (Fed. Cir. 2009) ...................... 21, 23

*Trebro Mfg., Inc., v. Firefly Equip.*, LLC, 748 F.3d 1159 (Fed. Cir. 2014) ................................ 12

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996) .................................. 13, 14

**Statutes**
35 U.S.C. §§ 102, 103, and/or 112............................................................................................. 22

## I.      INTRODUCTION

Socket Solutions, LLC ("Socket Solutions") is an Amazon success story.  It is a U.S. company that created a unique product, which it sells under its trademarked brand, Sleek Socket®.  With Sleek Socket®, Socket Solutions created an entirely new market niche on Amazon.com.  The flagship Sleek Socket® product is an ultra-flat cover for an electrical wall outlet with an extension cord and a power strip.  It blends visually with the wall and eliminates dangerous cords dangling from the wall outlet.  It also is thin enough be used in wall outlets that otherwise would be blocked behind furniture.

When Socket Solutions launched this product, there was nothing like it on the market.  In building its business around this product, Socket Solutions did everything right.  It patented its invention, and it subjected its products to rigorous testing from a government-certified testing laboratory to ensure that the products complied fully with all applicable industry safety standards.  Socket Solutions was rewarded for its hard work with a product that became a "#1 Best Seller" on Amazon in the Electronic Multi-Outlet category and one of the top 12 "Most Wished For" items in the entire "Tools & Home Improvement" category.  Sleek Socket® has obtained more than 58,000 Amazon reviews with an average rating of 4.7 out of 5.

Socket Solutions' remarkable success has attracted the attention of copycats who seek to exploit the goodwill that Socket Solutions built in this market niche.  These copyists are selling cheap versions of the patented invention and are cutting corners by, for example, bypassing the safety certification process.  Defendant Import Global, LLC ("Global") is one of those sellers.  Moreover, Global is selling infringing products that not only lack safety certification but in fact are unsafe and incapable of obtaining safety certification.  Global also is selling its knock-off

products at a discount that undercuts Socket Solutions' prices, thereby siphoning off Socket Solutions' sales and market share.

Global sells its infringing product, under the brand "Neat Socket" on Amazon.com in direct competition with the patented Sleek Socket® products. The infringing sales have harmed and continue to harm sales of the patented Sleek Socket® products, which is Socket Solutions' sole revenue source.

Global's efforts to exploit the Socket Solution's invention, however, extends beyond routine patent infringement. Global designed its product to look *identical* to the patented Sleek Socket® products. Global sells its infringing products under the brand name "Neat Socket," which sounds like Socket Solutions' registered trademark Sleek Socket®. Global even copied the appearance the Sleek Socket® product packaging and advertising.

In short, Global not only has appropriated the Socket Solutions' patented technology, but it has copied or mimicked the Sleek Socket® appearance, name, packaging, and advertising content. By designing and promoting its product in a way to closely simulate the patented Sleek Socket® products, Global is exploiting Socket Solutions' goodwill and is trading off the reputation that Socket Solutions generated over a five-year period for its innovative, highly rated, best-selling products. The harm caused by Global's exploitation of Socket Solutions' technology and reputation is exacerbated by the fact that the Neat Socket product, unlike the Sleek Socket® product, has not been certified as complying with industry safety standards and in fact violates an important industry safety standard. Global is fostering association and consumer confusion between its infringing Neat Socket product and the patented, safety-certified Sleek Socket® products tarnishing Socket Solutions' reputation for selling high-quality, safety-certified products. These reputational harms that Global's infringement is inflicting on Socket Solutions cannot be

remedied by money damages alone.  Accordingly, Socket Solutions seeks a preliminary injunction to halt Global's exploitive infringement.

## II.    FACT BACKGROUND

Socket Solutions is a U.S. company based in Texas, which sells a line of home décor products that replace a home's unsightly, unsafe bulky plugs and cords with an aesthetically pleasing, ultra-thin plug that looks like a blank wall plate and allows furniture to be pushed flush against the electrical wall outlet.   Declaration of Michael George Insalaco (Ex. 1) at ¶¶ 2, 4-5.  Socket Solutions sells these products under the Sleek Socket® brand and is the worldwide exclusive manufacturer of the Sleek Socket® product line.  Ex. 1 at ¶ 4.

### A.    The Sleek Socket® Products

The Sleek Socket® products offer unique benefits.  Ex. 1 at ¶¶ 4-6.  They blend visually with the wall and are aesthetically pleasing while mitigating potential fire hazards from pinched plugs and cords.  Ex. 1 at ¶ 5.  Below to the left is an image of a Sleek Socket® product and below to the right is a before-and-after picture showing a Sleek Socket® product in use on an electrical wall outlet.  Ex. 1 at ¶ 5.



The Sleek Socket® products were the first commercially successful products of their kind. Ex. 1 at ¶ 6.  With Sleek Socket®, Socket Solutions created a new market niche for home décor products that hide unsightly, unsafe and bulky plugs and cords while concealing the underlying outlet.  Ex. 1 at ¶ 6.  Socket Solutions invested heavily in marketing and advertising, spending more than $6 million over the past 6 years to build its brand and develop this new market niche. Ex. 1 at ¶ 9.  Socket Solutions also invested time and money to ensure that the Sleek Socket® products passed rigorous testing to obtain genuine safety certification under strict industry standards. Ex.1 at ¶ 7.   Through innovation, quality, and ongoing adherence to safety protocols, Sleek Socket® products have become the #1 Best Seller in "Electrical Multi-Outlets" with over 58,000 product reviews and a 4.7 out of 5 customer rating.  Ex. 1 at ¶ 8.  The Sleek Socket® products are the #1 "Most Wished For" product in the "Electrical Multi-Outlets" category (Ex. 1 at ¶ 11) and have received the "Amazon's Choice" label, which Amazon issues to selected products that Amazon has designated as "highly rated, well-priced and available to ship immediately."  Ex. 1 at ¶ 9.

The patented Sleek Socket® products are the only products that Socket Solutions sells; they account for essentially all of Socket Solutions' revenues.  Ex. 1 at ¶ 12.  All of these revenues are derived from eCommerce, and approximately 99 percent of those revenues are generated from U.S. sales through Amazon.com.  Ex. 1 at ¶ 13-14.

Socket Solutions has created an intellectual property portfolio that includes U.S. Patent No. 9,509,080 ("the '080 Patent") (Ex. 2).  The Sleek Socket® product line practices various claims of the '080 patent.  Ex. 1 at ¶ 15.

**B.     The '080 Patent**

The '080 Patent is entitled "Functional Indoor Electrical Wall Outlet Cover."  As the patent states, the invention relates to an "indoor electrical wall outlet cover permitting functional use of

4

an electrical wall outlet while fully concealing the plug contact openings of the outlet."  Ex. 2, "Abstract."  The "Summary of the Invention" explains that the invention "is aesthetically pleasing . . . because the outlet cover, at least in one embodiment, is essentially or substantially blank, hides the receptacles of the outlet completely, and results in only one cord extending from the outlet. . . ."  Ex. 2 at 1:55-61.[1]  This section of the patent also describes other benefits of the invention:

> The present invention provides an indoor electrical wall outlet cover that is thin enough to avoid adding bulk to the outlet and thus enables furniture to effectively be positioned against the wall or at least as close as the baseboard on the wall, that also effectively covers the outlet so as to act as a safety device for a child that may seek to touch or access the outlet receptacles, and that still allows ready access to the electrical connection that the outlet affords.

Ex. 2 at 1:47-55.

The '080 patent provides a "Detailed Description of Preferred Embodiments" of the invention (Ex. 2 at 2:48 to 7:20), together with Figures that illustrate these "preferred embodiments" in drawings.  Ex. 2 at 2:24-26.  Figure 1 of the '080 Patent, shown below, illustrates a "front perspective view . . . of one embodiment of the apparatus of the invention, as shown in place on an electrical outlet as it might typically be used."  Ex. 2 at 2:27-30.

---

[1] References to the '080 patent (Ex. 2) are by column and row.  E.g., "1:55-61 refers to column 1, rows 55-61.

5



FIG. 1

In Figure 1, the patent illustrates "one embodiment" depicting a cover (15), a frontplate (12), a cord (16) and receptacles (26), found on power strip (29).  Ex. 2 at 3:23-31; 4:64-67; 5:5-10.

### C.    The Claimed Invention

For this motion, Socket Solutions asserts Claim 19, which claims:

An apparatus for hiding a standard indoor electrical wall outlet having at least two receptacles while affording continued use of that said outlet, the apparatus comprising:

  a.  a cover comprising:

   (i)  a frontplate; and

   (ii) a backplate comprising at least one set of electrical prongs including a hot prong, a neutral prong, and optionally a ground prong, positioned to correspond to a first receptacle of the wall outlet.

  b.  an electrical cord extending from the backplate, or the cover, said cord comprising at the cord's proximal end: at least one hot pin, at least one neutral pin and optionally a ground wire positioned on or fastened or attached to the backplate of the cover in such manner as to minimize distance between the front plate and the backplate, and respectively connected to or associated with the hot prong, neutral prong and any ground prong on the exterior of the backplate; and comprising at the cord's distal end at least one receptacle, and wherein the height of the hot pin, neutral pin, and any ground wire is approximately the same or less than the thickness of the cord.

### D.    The Accused Product

Global sells a device on Amazon.com that it identifies as a "Neat Socket 3ft Flat Extension Cord with USB Ports – Ultra Thin Flat Plug Extension Cord with 3 Outlets, 2 USB – Flat Outlet Extender – Universal Size Flat Plug Power Strip, Child & Pet Safe." ("Accused Product") (see image below from [www.amazon.com/Neat-Socket-Flat-Extension-Ports/dp/B0CDNPSXJV](www.amazon.com/Neat-Socket-Flat-Extension-Ports/dp/B0CDNPSXJV)). Global also sells an 8-foot version of that cord.



To all outward appearances, the Accused Product is essentially identical to the patented Sleek Socket® product, as illustrated in the images below comparing the Accused Product (left in each picture) and a genuine Sleek Socket® device (right in each picture).  Ex. 1 at ¶ 21.





Other than the writing on the underside of the Sleek Socket® cover, the two covers are indistinguishable to the consumer.

The only distinction between the Accused Products and the patented Sleek Socket® products[2] is found when one dismantles the cover by separating the larger frontplate from the

---

[2] While the number of outlets on the Accused Products' power strip differ from those on the corresponding Sleek Socket® product, this distinction has no bearing on the infringement claim. But as detailed below, the number of outlets on the Accused Products creates a safety hazard.

smaller backplate(s).  In both instances, the electronics, wires, pins and prongs are sandwiched in the narrow space between those two plates.  But whereas in the patented Sleek Socket® products, these electronics are simply mounted to the inside of a single backplate, in the Accused Product, these electronics are attached to another, smaller inner backplate that is both mounted on the inside of an outer backplate and also fastened with screws to the back of the frontplate.  The image below illustrates a sample of the patented Sleek Socket® products (right) with a sample of the Accused Product (left).  The Accused Product in this image depicts the position of the electrical components relative to the frontplate when the device is fully assembled.



The fact that in the Accused Product the small inner backplate is screwed to the frontplate, is functionally insignificant.  When the Accused Product is fully assembled, the small inner backplate that holds the electrical wiring and prongs is sandwiched tightly between the frontplate and the outer backplate.  The electrical prongs fit tightly through slots in the outer backplate so that the electrical components are in fact mounted on the outer backplate as illustrated in the photo below, which also compares the Accused Product (left) with the Sleek Socket® (right).  In this

image the screws in the Accused Product have been removed to illustrate the position of the electrical components relative to the outer backplate after full assembly.  As the photo illustrates, the Accused Product (left) is functionally identical to the patented Sleek Socket® products (right) in this regard.  The fact that the electrical components are screwed onto the frontplate makes no difference because when the product is fully assembled, the electrical components—with or without the screws—are held rigidly in place in the sandwich between the frontplate and the outer backplate.  The device would function in exactly the same way to get exactly the same result if the screws faced the other direction and screwed the electrical components into the outer backplate.



As explained and illustrated below, the Neat Socket "distinction" does not avoid infringement; the Accused Product practices each limitation of at least Claim 19 of the '080 patent.

Finally, like the Neat Socket name and the Neat Socket product, even the Neat Socket packaging and advertising mimics that of Sleek Socket®, as reflected in the images below.





11



### E.    Scope of Requested Preliminary Injunction

In this motion, Socket Solutions seeks to enforce the '080 patent to prevent Global from selling the Accused Product on Amazon.com and elsewhere in the United States.  For purposes of this motion, Socket Solutions asserts one representative claim (Claim 19) of the '080 patent.

### F.    Legal Standard for Preliminary Injunction

Since preliminary injunction motions are not unique to patent law, the courts apply regional circuit law rather than Federal Circuit law to the procedural issues raised in the motion.  *Trebro Mfg., Inc., v. Firefly Equip.*, LLC, 748 F.3d 1159, 1165 (Fed. Cir. 2014) (quoting *Aevoe Corp. v. AE Tech Co.*, 727 F.3d 1375, 1381 (Fed. Cir. 2013)).  On patent-specific issues, however, the courts apply Federal Circuit law.  *Id.* (quoting *Mikohn Gaming Corp. v. Acres Gaming, Inc.*, 165 F.3d 891, 894 (Fed. Cir. 1998)).

To obtain a preliminary injunction, a party must demonstrate:  (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4)

that the entry of the relief would serve the public interest. *Schiavo ex. rel Schindler v. Schiavo*, 403 F.3d 1223, 1225-26 (11th Cir. 2005) (per curiam).

### 1. Socket Solutions Is Likely to Succeed on the Merits.

To establish a "likelihood of success on the merits" on a patent infringement claim, the party seeking a preliminary injunction must establish that it is "more likely than not" to prevail on its claim at trial. *Revision Military, Inc*. v. Balboa Mfg. Co., 700 F.3d 524, 526 (Fed. Cir. 2012). To establish a "likelihood of success on the merits," therefore, a plaintiff must show it is more likely than not at trial to prove infringement and to defeat any invalidity defense.

A patent owner may prove infringement under either a literal infringement theory or under the doctrine of equivalents. *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 149 F.3d 1309, 1318 (Fed. Cir. 1998) (describing the doctrine of equivalents as "a viable alternative to literal infringement."). For a product to infringe a given patent claim, therefore, each "limitation" of that claim must be found in the product either literally or through an equivalent. Each limitation of claim 19 is found literally in the in the Accused Product.

### a) The Accused Product Infringes Claim 19.

A literal patent infringement analysis involves two steps: (1) "the proper construction of the asserted claim"; and (2) "a determination as to whether the accused method or product infringes the asserted claim as properly construed." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1581-82 (Fed. Cir. 1996). When an accused device includes every limitation of a patent claim, it literally infringes that claim. *Cole v. Kimberly-Clark Corp.*, 102 F.3d 524, 532 (Fed. Cir. 1996).

### (1) Claim Construction Principles

Claim construction "is a matter of law exclusively for the court." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), aff'd on other grounds, 517 U.S. 370 (. In interpreting an asserted claim, courts primarily look to the "intrinsic evidence"; i.e., the

patent itself—which includes the claims and the specification—and the prosecution history, if it is in evidence. *Vitronics Corp.*, 90 F.3d at 1582.

First, courts look at the words of the claims themselves. *Id.* Words in a claim generally are given their ordinary and customary meaning, unless the patentee chooses to be his own "lexicographer" and provides a special definition that is clearly stated in the intrinsic evidence. *Id.*

Second, the courts must review the specification to assess whether the inventor used the specification to define a term "expressly" or "by implication." *Id.* While the specification is "highly relevant" to the claim construction analysis (*Id.*, the Federal Circuit has cautioned against needlessly restricting claims to the preferred embodiments. *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340 (Fed. Cir. 2001). If the claim itself does not contain language that restricts the invention to a feature or characteristic described in the preferred embodiments, the claim should not be read restrictively unless the inventor stated clearly in the specification that the feature or characteristic in question applies to the invention as a whole and not merely to certain preferred embodiments. *Alloc, Inc. v. ITC*, 342 F.3d 1361, 1370 (Fed Cir. 2003).

Third, courts construing claim terms may consider whether the patent "prosecution history" sheds light on the disputed claim terms. *Vitronics Corp.*, 90 F.3d at 1582. The prosecution history is not at issue here.

### (2)   The Accused Product Meets Each Claim Limitation.

As detailed below, there is a one-to-one correspondence between the structures in the Accused Product and each limitation of Claim 19.

### (a)   Claim Preamble

*An apparatus for hiding a standard indoor electrical wall outlet having at least two receptacles while affording continued use of that said outlet, the apparatus comprising:*

The Claim 19 preamble is not a limitation because it merely describes the "overall purpose" of the invention (*see Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002Cias).  But even if it were a limitation, there is no dispute that the Accused Product embodies the language of the preamble by hiding a standard wall outlet as illustrated by comparing Fig. 1 from the '080 Patent (left) with an image of the Accused Product (right).



Global's advertising for its product on Amazon.com, shown below, likewise reflects that its device is designed to hide a standard wall outlet while allowing use of the outlet:  "Effectively and Safely Hides Ugly and Bulky Electrical Outlets."

**Effectively and Safely Hides Ugly and Bulky Electrical Outlets.**



The Neat Socket blends in so well with your wall that you'll forget it's there! Includes an Adhesive Cord Management Kit with removable, double-sided adhesive strips, and adhesive cord clips that hold the cord(s) against the wall, concealing the neat socket to guests and curious children and pets.

#### (b)    Cover

*a cover comprising:*

*(i) a frontplate; and*

*(ii) a backplate comprising at least one set of electrical prongs including a hot prong, a neutral prong, and optionally a ground prong, positioned to correspond to a first receptacle of the wall outlet*

The claim requires a cover comprising a frontplate and a backplate. The term "comprising" is generally understood to mean "including but not limited to." *CIAS, Inc. v. All. Gaming Corp.*, 504 F.3d 1356, 1360 (Fed. Cir. 2007). Accordingly, if the Accused Product has a "frontplate" and a "backplate" as defined in Claim 19, then it has the claimed "cover."

As illustrated below, the Accused Product includes a "frontplate" that conceals the wall outlet.

16



The Accused Product also has a "backplate."  Claim 19 requires: "a backplate comprising at least one set of electrical prongs, including a hot prong, a neutral prong, and optionally a ground prong, positioned to correspond to a first receptacle of the wall outlet."  Thus, as defined in Claim 19, the backplate includes, but is not limited to, "one set of electrical prongs, including a hot prong, a neutral prong, and optionally a ground prong, positioned to correspond to a first receptacle of the wall outlet."  The Accused Product includes a plate (divided into two pieces: the inner backplate and the outer backplate) that covers the electrical wiring and includes a set of electrical prongs that correspond with a wall outlet receptacle.  This structure falls within the definition of the claimed "backplate."



Because the Accused Product includes a frontplate and a backplate, the Accused Product necessarily includes the claimed "cover."

In an informal opinion that Global's counsel shared with Socket Solutions (Ex. 2), Global asserts that the Accused Product does not infringe because it "has the electrical prongs mounted on the **front plate** in contrast to the Socket Solution Socket Patents requiring the electrical prongs mounted on the **back plate**." Ex. 2, p. 2 (emphasis in original). Global's opinion is flawed on multiple grounds. First, it is based on the false premise that in the Accused Product the electrical prongs are mounted on the front plate *and not the backplate*. The two are not mutually exclusive. In fact, as explained and illustrated above, the inner backplate (which bears the electrical prongs) is *both* screwed into the frontplate *and* mounted onto the outer backplate (which Global identifies as the "backplate").

Global appears to attribute significance to the fact that the inner backplate is attached more strongly to the frontplate. But this fact has no bearing on the patent infringement issue. The

electrical prongs are attached to the inner backplate which is mounted on the outer backplate, as discussed above.  When assembled, the inner backplate is fixed in place relative both to the frontplate and to the outer backplate.  Global does not explain why its decision to screw the inner backplate onto the frontplate somehow negates the fact that it has a "backplate comprising at least one set of electrical prongs" as illustrated in the images above.

### (c)      Proximal End of Cord

*b. an electrical cord extending from the backplate, or the cover, said cord comprising at the cord's proximal end: at least one hot pin, at least one neutral pin and optionally a ground wire positioned on or fastened or attached to the backplate of the cover in such manner as to minimize distance between the front plate and the backplate, and respectively connected to or associated with the hot prong, neutral prong and any ground prong on the exterior of the backplate;*

As illustrated below, the Accused Product includes an electrical cord extending from the backplate.  Likewise, the proximal end of the cord includes a hot pin, a neutral pin and a ground wire attached to the backplate, and respectively connected to or associated with the hot prong, neutral prong and ground wire on the exterior of the backplate.  Accordingly, the Accused Product meets the claim limitations for the proximal end of the cord.



**(d)     Distal End of Cord**

*and comprising at the cord's distal end at least one receptacle,*

The Accused Product contains multiple receptacles at the cord's distal end, as shown in the annotated image below:



20

(e)     **Pin Requirement**

*and wherein the height of the hot pin, neutral pin, and any ground wire in approximately the same or less than the thickness of the cord.*

As illustrated in the image below, the pins in the Accused Product consist of a few drops of solder, which electrically connects the wires from the cord to the back of the prongs.  It is apparent from the image that the solder pins are no taller than the cord is thick, i.e., that the pin "height" is "approximately the same or less than the thickness of the cord."  This limitation ensures that the cover in which the pins are sandwiched remains very thin and flat. The pins here plainly do not add bulk to the cover or cause it to jut out significantly from the wall—which is why the cover on the Accused Product is just as thin as the cover on the patented Sleek Socket® products.



**b)     Socket Solutions Is Unaware of any Invalidity Arguments.**

At the preliminary injunction stage, the Court considers the evidence in light of the presumptions and burdens that will apply at trial.  *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1376 (Fed. Cir. 2009).  At trial, Socket Solutions bears the burden of proving infringement (preponderance standard). *Symbol Technologies, Inc. v. Opticon, Inc.*, 935 F.2d 1569,

1574 (Fed. Cir. 1991).  But since patents carry a presumption of validity, Global bears the burden of overcoming that presumption and proving any invalidity defense by "clear and convincing" evidence.  *Id.* at 1580.  To establish that Socket Solutions is not likely to succeed on an invalidity defense, Global must establish that it is likely to prove its invalidity defense clearly and convincingly at trial.

Global asserts an affirmative defense of invalidity based on a general allegation that: "The claims 1-24 of the '080 Patent are invalid as anticipated or obvious under 35 U.S.C. §§ 102, 103, and/or 112."  Dkt. 8 at p. 4.  Anticipation and obviousness are prior art defenses, and Global does not identify any prior art.  Accordingly, Socket Solutions has no way to evaluate this affirmative defense, which merely recites a legal defense *theory* without pleading a single supporting *fact*.

Although Global asserts a declaratory judgment counterclaim, it does not appear ask the Court for a declaration that any '080 Patent claims are invalid.  Dkt. 8 at p. 13.  Global identifies a handful of claim terms and limitations that it characterizes as sufficiently "vague" to render claim 19 "indefinite" and therefore invalid (see Dkt. 8 at ¶¶ 26, 31, 33, 35, 38 and 39).  To prevail on an indefiniteness claim, however, a defendant must prove by clear and convincing evidence that the allegedly indefinite language, "read in light of the specification delineating the patent, and the prosecution history, fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention."  *Nautilus, Inc. v. Biosig Instruments, Inc.*, 52 U.S. 898, 901 (2014).  Global fails to allege any facts supporting an argument that the language in question would fail to inform persons skilled in the art about the scope of the invention.  Indeed, the claimed invention, as detailed above, is straightforward and easily understood even to a lay person.  To the extent that Global actually asserts an "indefiniteness" defense, that defense is highly unlikely to succeed.

## 2.      Global's Infringement Is Causing Irreparable Harm.

"[T]he irreparable harm inquiry seeks to measure harms that no damages payment, however great, could address." *Celsis* In *Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012).

### a)      Lost Sales and Lost Market Share.

The Accused Product sales are harming Socket Solutions in various ways.  First, the Accused Products compete head-to-head with the patented Sleek Socket® products on Amazon.com, where Socket Solutions earns virtually 100% of its revenue.  Ex. 1 at ¶ 32.  Although Global launched the Neat Socket relatively recently, it has positioned its product on Amazon as a lower-priced substitute for the Sleek Socket® products.  Accordingly, Socket Solutions has lost revenue and market share to the Accused Products, and it will continue to do so if the infringement is not stopped.  Ex. 1 at ¶ 32.  This harm alone can be irreparable.  See *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1345 (Fed. Cir. 2013) ("Where two companies are in competition against one another, the patentee suffers the harm—often irreparable—of being forced to compete against products that incorporate and infringe its own patented inventions.")

### b)      Harm to Reputation and Goodwill.

The harm that Global is causing Socket Solutions in lost sales and market share is exacerbated by the damage Global's infringement is causing to Socket Solutions' goodwill and reputation.  *See Aria Diagnostics, Inc. v. Sequenom, Inc.*, 726 F.3d 1296, 1304 (Fed. Cir. 2013) (recognizing damage to reputation as valid grounds for finding irreparable harm).

First, while the patented Sleek Socket® products enjoy customer ratings that are significantly higher than the Accused Products (Ex.1 at ¶ 51), the Accused Products are able to divert sales because Global has not only appropriated the patented Sleek Socket® features (Ex. 1 at ¶¶ 17, 35) but also has copied the products appearance and mimicked the brand name and the

product packaging.  Ex. 1 at ¶¶ 14, 18, 21, 31.  In short, it has set itself up as a Sleek Socket®
look-alike.  Significantly, while it may look identical to the Sleek Socket® products, the Accused
Product has not been certified in compliance with applicable UL safety standards.  Ex. 1 at ¶ 36.
In competing with Socket Solutions, Global has cut corners and is selling an electrical product that
lacks safety certification—which makes it an objectively inferior product.  As the Federal Circuit
has noted, an infringing competitor who sells an inferior product that incorporates patented
technology is likely to cause irreparable harm by not only by diverting sales but also by eroding
the patent owner's "reputation and brand distinction."  *Douglas Dynamics*, 717 F.3d at 1344.

In *Douglas Dynamics*, the Federal Circuit explained this point using the district court's
analogy, which compared the patent owner's superior product to a Mercedes Benz S550 and the
infringing product to a Ford Taurus.  The court noted that buyers interested in purchasing a
Mercedes, when presented with both choices, ordinarily may be unlikely to switch to the Ford or
vice versa.

> However, if the Ford made its place in the market by infringing on the intellectual
> property of the Mercedes and capitalized on its similarity to the better product, then
> the harm to the Mercedes product might go beyond a simple counting of lost sales—
> some of which would occur anyway if the Ford marketed itself effectively as a
> "Mercedes at half the price." The Mercedes would lose some of its distinctiveness
> and market lure because competitors could contend that they had "similar features"
> without noting that those features infringe Mercedes's proprietary technologies.

*Douglas Dynamics*, 717 F.3d at 1344.  The association created between the lesser, "knock-off"
product diminishes the patented product's reputation while exploiting the goodwill the patented
product created.

The court's analogy applies here.  Socket Solutions is both the innovator for the patented
product and the business that used this product to create an entirely new market niche.  (Ex. 1 at
¶¶ 4, 6).  It built a reputation on Amazon with a high-quality product that is certified in full
compliance with all industry safety standards.  (Ex. 1 at ¶ 7).  Its average rating of 4.7 out of 5

from more than 58,000 customers establishes that it has generated valuable goodwill and a coveted reputation on Amazon.  Ex. 1 at ¶¶ 8-11.

Rather than create its own unique product, Global not only appropriated the patented technology, but it also copied the appearance of the patented Sleek Socket® products to the point that online consumers cannot tell them apart.  Ex. 1 at ¶ 21.  As illustrated above (at pp. 7-8), the products are virtually indistinguishable by outward appearance.

Global also chose to brand its product as "Neat Socket"—which is a sound-alike for "Sleek Socket"—Socket Solutions' trademarked brand.  Ex. 1 at ¶ 14, 33.  Accordingly, Global not only exploited Socket Solutions' reputation and goodwill by appropriating its patented technology, but it also is exploiting the goodwill associated with Socket Solutions' brand name and the distinctive look of the Sleek Socket® products.  Ex. 1 at ¶ 54.  Global has gone so far as to copy the look of the Sleek Socket® product packaging.  Ex. 1 at ¶ 31.   Global also purchased advertising to promote the Accused Products next to the Sleek Socket® products in the search results when Amazon customer search for "Sleek Socket."  Ex. 1 at ¶ 55.

In short, Global has positioned the Accused Product itself as close as possible to the patented Sleek Socket® products to piggy-back on the goodwill Socket Solutions created through years of advertising, promoting, and selling the genuine, patented, safety-certified Sleek Socket® products.

The evidence reflects that Global, like Ford in the Federal Circuit analogy, has made its place in the market by infringing on the intellectual property of the patent owner and capitalizing on its similarity to the better product.  Accordingly, Global is causing irreparable harm to Socket Solutions not only by appropriating for itself the benefits of the Sleek Socket® technology, but also

by exploiting the Sleek Socket® reputation and goodwill to divert sales from the Sleek Socket® products.

In addition, Global's infringing sales are tarnishing the Sleek Socket® brand.  Unlike Socket Solutions, Global has skipped the regulatory process for consumer safety certification and compliance.  Ex. 1 at ¶¶ 36, 39-40.  The Accused Product, which has capitalized on its efforts to associate itself with the highly rated and safety-certified Sleek Socket® products, is eroding the Sleek Socket® goodwill and reputation through that association.  Ex. 1 at ¶¶ 54-61.  To use the Mercedes-Ford analogy above, Global in effect is selling a Ford Taurus that has appropriated the Mercedes proprietary technology and has capitalized on its similarity to the better product while failing to have its braking system safety-certified.  The fact that Global's product is not safety certified establishes a meaningful quality gap between patented products and the knock-off, which increases the extent to which Global's infringement is harming Socket Solutions' goodwill and reputation.  Ex. 1 at ¶ 59.

This harm is multiplied by the fact that Global's product not only lacks safety certification, but it is *incapable* of obtaining certification because it violates industry safety standards—specifically UL Standard 817—and presents a genuine and serious safety hazard.  Ex. 1 at ¶ 43.  As detailed in the declaration of Michael J. Insalaco, the Accused Products use an electrical cord that is insufficient to carry the electrical current required to power the number of electrical receptacles on its power strip.  Ex. 1 at ¶ 44.

Cord gauge is an important variable to consider when designing an extension cord because it is a limiting factor for electrical current; a given cord can handle only so much current.  Ex. 1 at ¶ 48.  An extension cord's power strip, therefore, must be matched properly with the right gauge cord.  If the power strip contains too many receptacles, the electrical devices plugged into it may

draw more current than the cord can safely manage.  Ex. 1 at ¶ 48.  When the current exceeds the cord's capacity, it may cause an electrical event, which might result in serious physical injury or death by electrical shock.  Ex. 1 at ¶ 48.

The Accused Product uses a 16-gauge cord.   Ex. 1 at ¶ 46.  According to UL Standard 817, when using a 16-gauge cord in an extension cord, and the power strip includes any USB ports, the power strip may have no more than two standard (3-prong) outlets.  Ex. 1 at ¶ 49.  The power strip on the Accused Products contains three standard outlets—which exceeds the maximum capacity for a 16-gauge cord. Ex. 1 at ¶¶ 45, 50.  Accordingly, the Accused Product cannot comply with UL safety standards and, in fact, presents a serious safety hazard that potentially could lead to injury or death.  Ex. 1 at ¶¶ 51-52.

Yet, Global promotes this product as safe for consumers and specifically, for small children.  Ex. 1 at ¶ 42.  Global's Amazon listing repeatedly emphasizes safety—claiming that the Accused Products "are meticulously designed to conceal electrical sockets, [while] seamlessly integrating safety . . . ."  Ex. 1 at ¶ 53.

By deliberately fostering an association between its hazardous Neat Socket products and the safety-certified, patented Sleek Socket® products, Global tarnishes Socket Solutions' reputation and goodwill.  Any accident caused by the Accused Product would harm not only Global but other sellers in this market niche—particularly Socket Solutions, which created this niche, and is Amazon's best seller in the category and the best-known brand in this niche.  Ex. 1 at ¶¶ 60-61.

Finally, by siphoning off actual and potential Sleek Socket® customers, Global threatens the goodwill that Socket Solutions created through the Amazon labels it earned as "#1 Best Seller" and "Most Wished For" product.  Ex. 1 at ¶ 62.  If Socket Solutions continues to lose market share

to the Accused Products, it may lose those labels, which have substantial marketing value.  Ex. 1 at ¶ 62.  That loss would irreparably harm Socket Solutions.  Ex. 1 at ¶ 62.

**c)      Lost Benefit of the Patent.**

Naturally, the infringing sales also will deprive Socket Solutions of the principal benefit of its patent. As the Federal Circuit has held, "[b]ecause the principal value of a patent is its statutory right to exclude, the nature of the patent grant weighs against holding that monetary damages will always suffice to make the patentee whole." *Reebok Int'l Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1557 (Fed. Cir. 1994); *see also Robert Bosch, LLC v. Pylon Mfg. Corp.*, 659 F.3d 1147, 1149 (Fed. Cir. 2011)  ("While a patentee's right to exclude alone cannot justify an injunction, it should not be ignored either.")

It is entirely appropriate to consider the nature of the patent grant in the irreparable harm analysis because patents are time-limited rights.  The patent term continues to run during litigation, and the loss of patent-supported exclusivity during potentially years of litigation may exhaust the life of the patent and deplete the invention's value to the inventor.  See *Douglas Dynamics*, 717 F.3d at 1345 ("Exclusivity is closely related to the fundamental nature of patents as property rights. It is an intangible asset that is part of a company's reputation, and here, [patent owner's] exclusive right to make, use, and sell the patented inventions is under attack by [defendant's] infringement.").

In the present case, the principal benefit of the '080 Patent to Socket Solutions is the exclusivity it provides.  Unlike some patentees, Socket Solutions has never licensed others to manufacture its patented products.  Ex. 1 at ¶ 63.  This exclusivity was particularly important to Socket Solutions, which derives revenue entirely from online sales.  Ex. 1 at ¶¶ 12-14.  An injunction here will allow Socket Solutions to maintain exclusivity on products embodying its invention—which is the *sole* benefit it derives from its '080 Patent.  In addition, an injunction

28

likely will deter other infringers who otherwise might be tempted to piggy-back on Socket Solutions' success and exploit the market that Socket Solutions created with the patented Sleek Socket® products.

### d) Lost Management Time Is Non-Compensable Harm.

Global may respond to this motion by arguing that all the harms experienced by the patentee can be addressed with monetary damages.  But money damages alone cannot compensate Socket Solutions for the harms identified above.

In addition, Global's infringement is harming Socket Solutions irreparably by diverting valuable (and severely limited) corporate time, resources and energy.  Ex. 1 at ¶ 65.  Socket Solutions' inventor and sole manager operates the business with the assistance of one employee. Ex. 1 at ¶ 65.  That is the corporate work force for Socket Solutions.  It is a small business.  Ex. 1 at ¶ 65.  Aside from the financial strain from litigating against Global, this litigation is a tremendous distraction and burden on such a small company.  Ex. 1 ¶ 65.  In the time that Socket Solutions' two workers spend litigating against infringers like Global, they could be growing the business, expanding into new marketplaces beyond the U.S., Canada and Mexico, creating new product designs and variations to be patented and ultimately sold, expanding Socket Solutions' distribution to traditional retail (i.e., brick and mortar stores), and dealing with suppliers and supply chain issues.  Ex. 1 at ¶ 66.

As long as Global's infringement persists unabated, legal expenses may be recouped in part, but lost management time is not compensable and is gone forever.  Ex. 1 at ¶ 67.

### 3. The Balance of Hardships Favors Socket Solutions

In "balancing the hardships," the Court must weigh the harm to the accused infringer if the Court wrongly issues a preliminary injunction against the harm to the patentee if the Court wrongly

denies the injunction.  *H.H. Robertson, Co. v. United Steel Deck, Inc.*, 820 F.2d 384, 390 (Fed. Cir. 1987).

In weighing these harms, the Court must consider the patentee's likelihood of success on the merits.  *H.H. Robertson*, 820 F.2d at 390.  The higher the patentee's likelihood of success, the less likely that accused infringer would be "harmed" at all.  This balance of hardships factor tilts in Socket Solutions' favor because Socket Solutions is highly likely to succeed on the merits as reflected above.  The Accused Product not only meets all the limitations of Claim 19, but it also essentially practices the preferred embodiment illustrated in the patent.

The balance of hardships factor weighs in Socket Solutions' favor for other reasons as well. Even if Global could show that it would be harmed by an injunction, that harm would not exceed the irreparable harm Socket Solutions would suffer if the infringement were to continue, as identified above.  Global has been on notice of Socket Solutions' patent and took a calculated risk by continuing to engage in patent infringement.  Under such circumstances, courts sometimes refuse to assign any "harm" to the defendant because it assumed the risk.  See *Celsis in Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 931 (Fed. Cir. 2012) ("[T]he preliminary record suggests that LTC's losses were the result of its own calculated risk in selling a product with knowledge of Celsis' patent").

Moreover, if Global were to provide credible evidence of harm, that harm could be offset by an injunction bond and would ensure that Global received compensation.  Conversely, Socket Solutions has no such assurance.

Finally, in the unlikely event that the balance of hardships factor did not weigh in Socket Solutions' favor, a neutral finding on this factor would not change the outcome.  See *Hybritech Inc. v. Abbott Laboratories*, 849 F.2d 1446, 1457-58 (Fed. Cir. 1988) (affirming preliminary

injunction despite the district court's finding that "neither party has a clear advantage" on the balance of hardships factor for preliminary injunction).

### 4.   Public Interest Favors Socket Solutions

The public interest analysis here also weighs in Socket Solutions' favor. First, as the Federal Circuit has recognized, public interest favors the enforcement of patent rights. *PPG Indus., Inc. v. Guardian Indus. Corp.*, 75 F.3d 1558, 1567 (Fed. Cir. 1996). The question is not whether the public has *some* interest that would be injured by the grant of preliminary relief. The question is whether a preliminary injunction would injure some particular, "critical public interest." *Hybritech Inc.*, 849 F.2d at 1458.

In the present case, the public has no "critical" interest in having Global continue to sell its consumer wall outlet concealer product—particularly when that product is unsafe and Global is trying to create consumer confusion. Conversely, the public does have an interest in enjoining cheap copies of patented inventions, "which have the effect of inhibiting innovation and incentive." *Douglas Dynamics*, 717 F.3d at 1346. "This detrimental effect, coupled with the public's general public interest in the judicial protection of property rights in inventive technology, outweighs any interest the public has in purchasing cheaper infringing products." *Id.* Accordingly, the public interest factor supports a preliminary injunction here.

## III.   CONCLUSION

Socket Solutions asks this Court to enter the Proposed Order (attached), which preliminarily enjoins Global (until this action is fully resolved) from making, using, selling, offering to sell, or importing into the United States, the Accused Product and any other products that are not more than colorably different from it.

Dated:  January 8, 2024                    Respectfully submitted,

                                           /s/ *Jason P. Stearns*
                                           Jason P. Stearns
                                           Florida Bar No. 059550
                                           Sarah A. Gottlieb
                                           Florida Bar No. 125232
                                           **SMITH GAMBRELL & RUSSELL LLP**
                                           201 North Franklin Street, Suite 3550
                                           Tampa, FL  33602
                                           Phone:  813-488-2920
                                           Fax:  813-488-2960
                                           E-mail:  jstearns@sgrlaw.com
                                           E-mail:  sgottlieb@sgrlaw.com

                                           Edward H. Rice (pro se pending)
                                           **LAW OFFICE OF EDWARD H. RICE, LLC**
                                           555 Skokie Blvd., Suite 500
                                           Northbrook, IL 60062
                                           Phone:  (312) 953-4566
                                           E-mail:  ed@edwardricelaw.com

## CERTIFICATION OF SERVICE

I CERTIFY that the within document has been filed on this 8th day of January, 2024 through

the CM/ECF system which will serve all counsel of record.

                                           /s/ *Jason P. Stearns*
                                           Jason P. Stearns

32