## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 1:23-cv-24517-DSL

SOCKET SOLUTIONS, LLC,

     Plaintiff,

v.

IMPORT GLOBAL, LLC,

     Defendant.

_____/

### REPORT AND RECOMMENDATIONS ON CLAIM CONSTRUCTION

**THIS CAUSE** is before the Court for claim construction of the patent forming the basis of the instant infringement action pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996). Plaintiff filed its initial brief on claim construction as a motion (ECF No. 59). Defendant filed a Response, to which Plaintiff filed a reply. The Court conducted an evidentiary *Markman* hearing on July 18, 2024. The Court has carefully considered the Parties' briefing, arguments and evidence presented during the *Markman* hearing, and the pertinent portions of the record.

## I.    BACKGROUND

Plaintiff Socket Solutions, LLC brought this action against Defendant Import Global, LLC for infringement of U.S. Patent No. 9,509,080 ("the '080 Patent"). The '080 Patent discloses "indoor electrical wall outlet cover permitting functional use of an electrical wall outlet while fully concealing the plug contact openings of the outlet." '080 Patent (Abstract). When a typical electrical plug is connected to the wall outlet, the plug and cord extend several inches from the wall, requiring that furniture be positioned away from the wall to accommodate that plug and someone's hand in reaching behind the furniture to insert the plug. *See* '080 Patent 1:20-30

(Background of the Invention). This wastes space and is generally unattractive. *Id.* Moreover, electrical outlets themselves are generally unattractive and pose a potential safety hazard for children, and while a blank cover plate may be used, it prevents the use of the outlet. The claimed invention solves this problem and "provides an indoor electrical wall outlet cover that is thin enough to avoid adding bulk to the outlet and thus enables furniture to effectively be positioned against the wall or at least as close as the baseboard of the wall." *Id.* at 1:47–51 (Summary of the Invention).  Moreover, the apparatus functions as a safety device and prevents children from accessing or touching the wall outlet while still allowing for its use. *Id.* at 1:51–54. The outlet cover is also aesthetically pleasing, unobtrusive, and calls less attention to itself than does a wall outlet without the cover of the invention. *Id.* at 1:55–57.

The invention accomplishes these objects by providing a thin cover that extends over the surface of the wall outlet, without extending significantly therefrom, having an electrical component on the backside that plugs into the outlet, providing for use of said outlet. *Id.* at 1:64–2:7. An electrical cord extends downward from the apparatus and out of the cover, falling flush with the wall, ending in one or more electrical receptacles. *Id.* at 2:7–15.

## II.     PRINCIPLES OF CLAIM CONSTRUCTION

Claim construction is the process of "determining the meaning and scope of the patent claims asserted to be infringed." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996). The words of a claim "are generally given their ordinary and customary meaning." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.*, as of the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed.

Cir. 2005). In defining words in a claim, "the court looks to 'those sources available to the public that show what a person of skill in the art would have understood [the] disputed claim language to mean.'" *Id.* at 1314 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed Cir. 2004)).

"[I]n interpreting an asserted claim, the court should look first to the intrinsic evidence of record, *i.e.*, the patent itself, including the claims, the specification and, if in evidence, the prosecution history." *Vitronics*, 90 F.3d at 1582. The specification of a patent "is always highly relevant to the claim construction analysis" and is usually dispositive. *Id.* It is viewed as "the single best guide to the meaning of a disputed term." *Id.*

Courts may also look to extrinsic evidence to determine the meaning of a disputed term. Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317 (citation omitted). A dictionary definition can be useful "so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." *Id.* at 1322–23 (citation and quotation omitted). When utilizing extrinsic evidence, courts must be mindful that it is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Id.* at 1317 (citation omitted).

Ultimately, "there is no magic formula or catechism for conducting claim construction." *Id.* at 1324. The court is also not "barred from considering any particular sources or required to analyze sources in any specific sequence." *Id.* "[W]hat matters is for the court to attach the appropriate weight to be assigned to those sources in light of the statutes and policies that inform patent law." *Id.*

III.    **CLAIMS AT ISSUE**

**A.  The '080 Patent**

The parties seek construction of six terms in Claim 19 of the '080 Patent.  Claim 19 reads:

An apparatus for hiding a standard indoor electrical wall outlet having at least two receptacles while affording continued use of said outlet, the apparatus comprising:

a. a *cover* comprising:

(i) a frontplate; and

(ii) a *backplate* comprising at least one set of electrical prongs including a hot prong, a neutral prong, and optionally a ground prong, positioned to correspond to a first receptacle of the wall outlet; and

b. an electrical cord extending from the backplate, or the cover, said cord comprising at the cords proximal end: at least one *hot pin*, at least one *neutral pin* and optionally a ground wire *positioned on or fastened or attached to the backplate of the cover in such manner as to minimize distance between the front plate and the backplate*, and respectively connected to or associated with the hot prong, neutral prong and any ground prong on the exterior of the backplate; and comprising at the cords distal end at least one receptacle, and wherein the height of the *hot pin*, *neutral pin*, and any ground wire is *approximately the same or less than the thickness of the cord*.

'080 Patent at 8:65-9:20 (emphasis added).

The disputed terms are italicized above: "cover;" "backplate;" "hot pin/neutral pin;" "positioned on or fastened or attached to the backplate in such a manner as to minimize distance between the front plate and backplate;" "approximately the same or less than the thickness of the cord;" and "thickness of the cord."[1] *See* (ECF No. 71).

The Court must interpret the claims in the light of "a person of ordinary skill in the art," ("POSITA"). Plaintiff advances the expert declaration of Matthew Spenko, a mechanical engineer, who opines that a person of ordinary skill in the art with respect to the '080 patent is someone with

---

[1] Initially, nine claim terms were disputed by the parties. However, Import Global has since amended its proposed definitions for three of those terms so that the parties now advance consistent definitions of those terms. *See* (ECF No. 71 at 4).

a Bachelor of Science degree in mechanical or electrical engineering or its equivalent, who has an understanding of basic principles of electricity and mechanical design. (ECF No. 59-2 at ¶ 12). Defendant has advanced no alternative opinion on what constitutes a POSITA, nor does it dispute the opinion advanced by Plaintiff. The undersigned agrees with Plaintiff's expert on the qualifications of a POSITA. *See Cayago Americas, Inc. v. Heinen*, 21-CV-61035, 2022 WL 1308549, at *2 (S.D. Fla. Apr. 29, 2022), *report and recommendation adopted*, 21-CV-61035-RAR, 2022 WL 1605286 (S.D. Fla. May 20, 2022).

### 1. Cover

The apparatus is essentially a functional outlet cover—a thin plate that fits over the wall outlet but enables use of the wall outlet via a cord that protrudes from the cover. The electrical components that enable the functionality are concealed within the cover.

Plaintiff proposes that "cover" be construed as "[a] structure that encloses the electrical components and hides a standard indoor electric wall outlet." (ECF No. 71 at 5). Defendant proposes that the term be construed to mean "[t]he portion of the apparatus that hides the standard indoor electrical wall outlet, and conceals the electrical components between the sandwich of the frontplate and the backplate." (ECF No. 70 at 7).

For context, patent claims generally contain three sections: a preamble, the transition, and the body. The preamble sets forth the type of invention being claimed (*i.e.*, "[a]n apparatus for hiding a standard indoor electrical wall outlet having at least two receptacles while affording continued use of said outlet"). The body of the claim sets forth the structural limitations, elements, or steps in the invention, and is most frequently the focus of claim construction. Between the preamble and body, the transition is the phrase that links the two. "Comprising" is open-ended,

meaning that the invention can include additional elements, but must include at least all of the elements listed in the claim.

The body of Claim 19 is broken into two subheadings, which respectively teach (a) a cover and (b) an electrical cord extending therefrom. In this format, the Claim presents "cover" as a preamble to the ensuing body. The cover that is taught in Claim 19 includes but is not limited to a frontplate and a backplate, as it is defined in Claim 19 to include at least one set of prongs positioned to correspond to the wall outlet. Read in light of the '080 Patent's specification, it is clear that the backplate, when attached to the front plate, conceals the pins and ground wire, forming the cover that hides an outlet. Indeed, both of the proposed constructions recognize these as integral characteristics of the "cover."

Defendant's proposal would further narrow the construction as concealing the electrical components between the "sandwich" of the frontplate and backplate. Defendant argued that the Plaintiff has used the "sandwich" analogy to describe the cover throughout its briefing as indication that Plaintiff must agree with this characterization. Plaintiff argued at the hearing that the description is not wrong so much as it is redundant, because Claim 19 elsewhere describes the oppositional relationship between the frontplate and the backplate and specifies the attachment of the electrical components between them. This is accurate, and Defendant's proposed construction interjects an unwarranted complication into an otherwise simple term. Plaintiff's proposal, which captures the essence on which both sides agree, is the construction the undersigned recommends that the Court adopt: "A structure that encloses the electrical components and hides a standard indoor electric wall outlet."

###### 2. "Backplate"

Claim 19 claims a "cover comprising a front plate and a backplate comprising at least one set of electrical prongs including a hot prong, a neutral prong, and optionally a ground prong, positioned to correspond to a first receptacle of the wall outlet." '080 Patent 9:1–6 (Claim 19). Plaintiff's proposed construction of the term "backplate" is the "component of the cover opposing the front plate." (ECF No. 71 at 5). Defendant's proposed construction of the term is the "portion of the apparatus closest to the wall outlet when the apparatus is plugged into the wall outlet." (ECF No. 70 at 7).

The Parties agree that the backplate is a portion of the cover situated between the front plate and the wall outlet. (ECF No. 71 at 5). Plaintiff objects to Defendant's proposed construction because it further requires that the backplate be closest to the wall when the apparatus is plugged in. (ECF No. 59 at 11). Defendant argues that because the apparatus is intended to be thin, a key feature of the invention, the Claim cannot be read as teaching a design that includes more than the two plates explicitly described—an outward facing frontplate, and *one* wall-facing back plate.

Plaintiff argues that Defendant's proposed construction of "backplate" is foreclosed by the use of the transitional word "comprising" in Claim 19. (ECF No. 59 at 11). "In the parlance of patent law, the transition 'comprising' creates a presumption that the recited elements are only a part of the device, that the claim does not exclude additional, unrecited elements." *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1348 (Fed. Cir. 2001). Claim 19 claims "a cover comprising: (i) a frontplate; and (ii) a backplate comprising . . . ." '080 Patent 9:1–3. The use of the term "comprising" signifies that "one cannot avoid infringement merely by adding elements if each element recited in the claims is found in the accused device." *Stiftung v. Renishaw PLC*, 945 F.2d 1173, 1178 (Fed. Cir. 1991) (internal quotations omitted). Use

7

of this term therefore includes in the '080 Patent's scope a cover "that employ[s] additional unrecited elements." *AFG Indus., Inc. v. Cardinal IG Co.*, 239 F.3d 1239, 1244 (Fed. Cir. 2001). Comparatively, if Claim 19 instead used the transitional phrase "consisting of," it would then be "understood to exclude any elements, steps, or ingredients not specified in the claim." *Id.* at 1245. Defendant's argument that it would be contrary to the language of the '080 Patent to include one or more plates between the front plate and the wall is foreclosed by the use of "comprising," which connotes that Claim 19 covers embodiments including additional plates.

Defendant cites language in the patent specification that describes a preferred embodiment in which "the cover 15 is inserted in the underlying electric wall outlet 11 and the front face of the cover or the outer or exterior surface of the frontplate component 12, resting on top of the backplate 14 which in turn is resting on top of the underlying electrical wall outlet 1. . . ." *See* (ECF No. 70 at 8); '080 Patent 4:16–21 (Specification). Defendant argues that this supports its proposed construction of backplate as the "portion of the apparatus closest to the wall outlet when the apparatus is plugged into the wall outlet," especially in light of the fact that even alternative embodiments not shown have this requirement. (ECF No. 70 at 8.)

But the specification is not to be read as imposing a limitation on Claim 19. *See 3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1321 (Fed. Cir. 2013) ("While we construe the claims in light of the specification, limitations discussed in the specification may not be read into the claims."). Even if alternative embodiments not shown have the backplate closest to the wall outlet, that alone is insufficient to impose a limitation on Claim 19. *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 908 (Fed. Cir. 2004) ("Although all embodiments described in the common specification of the '669 and '261 patents include a pressure jacket, the written description does not contain a clear disavowal of embodiments lacking a pressure jacket.").

Moreover, the specification provides that "[w]hile preferred embodiments of the present disclosure have been described, it should be understood that other various changes, adaptations and modifications can be made therein without departing from the spirit of the invention(s) and the scope of the appended claims." '080 Patent 7:7-11 (Specification). The specification makes clear that the patentee did not intend to disclaim those embodiments not described, namely, those in which the backplate is not the closest structure to the wall outlet. *See Abbott Lab'ys v. Sandoz, Inc.*, 566 F.3d 1282, 1288 (Fed. Cir. 2009) ("When the specification describes a single embodiment to enable the invention, this court will not limit broader claim language to that single application 'unless the patentee has demonstrated a clear intention to limit the claim scope using word or expressions of manifest exclusion or restriction.'" (quoting *Liebel-Flarsheim Co.*, 358 F.3d at 906)). As such, the undersigned is unwilling to read into Claim 19 a requirement that the backplate rest on the wall outlet simply because the specification describes a preferred embodiment in which it does.

Plaintiff's proposed construction of backplate as the "component of the cover opposing the front plate" is supported upon a reading of Claim 19 in light of the specification. *See* '080 Patent 3:62–65 (Specification) (". . . with the perimeter edge of backplate component 14 fitting inside the outer edge of frontplate component 12."); 4:35–39 ("Cover 15 is as thin as the thickness of the combination of the frontplate component 12 mounted on the backplate component 14 and the electrical pins 18 and 28, the ground wire 19, and electrical cord 16 in between the components 12 and 14."); 4:59–61 (". . . which are fully concealed under the backplate component 14 and the frontplate component 12 mounted to the backplate component."); 6:51–55 ("The frontplate component is sized to align and position over and curve slightly around the perimeter edge of the

backplate component for a tight fit as described above that preferably requires no adhesive or screws to stay in place.").

Nothing in the specification or Claim 19 requires that the backplate be immediately proximate to the wall outlet. *See Phillips*, 415 F.3d at 1316 ("The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998))).

Even Claim 19's requirement that the electrical components of the backplate be "positioned to correspond to a first receptacle of the wall outlet" does not support Defendant's proposed construction. '080 Patent 9:3-6 (Claim 19). This language requires only that the prongs be configured in such a way as to match the configuration of the contact openings[2] of a wall outlet. *See Respironics, Inc. v. Invacare Corp.*, 303 Fed. Appx. 865, 881 (Fed. Cir. 2008) ("[T]wo things 'correspond to' one another in the sense that they are 'similar, comparable, and/or matching'—the term's plain and ordinary meaning."). Nothing in the '080 Patent indicates that the patentee is using a "special definition . . . that differs from the meaning it would otherwise possess." *Phillips*, 415 F.3d at 1316; *GOJO Indus, Inc. v. Buckeye Int'l, Inc.*, No. 5:09-CV-2612, 2011 WL 1130461, at *1, 10 (N.D. Ohio Mar. 28, 2011) ("Absent an express intent to the contrary, a patentee is presumed to have intended the ordinary meaning of a claim term."). As such, the plain meaning of this language controls.  *See Vitronics Corp.*, 90 F.3d at 1582. It dictates only the configuration of the prongs, not the backplate's proximity to the wall outlet.

Defendant contends that Claim 19 imposes a condition on the relationship between the backplate and the front plate with the requirement of "in such a manner as to minimize the distance

---

[2] Contact opening refers to the slots on an electrical wall outlet into which the prongs of an electrical plug are inserted.

between the front plate and the backplate." (ECF No. 70 at 8). Defendant argues that because Claim 19 and the specification stress that the cover defined by the backplate and the front plate is to be thin, it would be contrary to the '080 Patent to insert one or more plates between the backplate and the front plate because such a plate would make the cover thicker. *Id.* at 10. Plaintiff points out that this argument assumes that in an embodiment with more than two plates, the rear-most plate would be the backplate. (ECF No. 71 at 6). In such an embodiment, Plaintiff contends that the backplate would still be the plate opposing the front plate and concealing the electrical components, but that it would no longer qualify as the backplate under Defendant's proposed construction. *Id.* at 7.

Were we to adopt Defendant's proposed construction, the backplate in the hypothetical above would be closest to the wall but would not conceal the electrical components of the claimed invention. It would instead comprise a front plate and some unnamed intermediate plate that together conceal the electrical components of the apparatus. Adopting Defendant's proposed construction ignores the practical function of the backplate in the claimed invention. It would restrict the meaning of backplate to a description of its proximity to the wall, and not, as is clear from the language of Claim 19, a description of its functional purpose as the counterpart to the front plate enclosing or concealing the electrical components. *See Phillips*, 415 F.3d at 1314 ("[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms . . . . [T]he context in which a term is used in the asserted claim can be highly instructive."). "While it perhaps may have been easier to label each face with generic terms that do not carry with them directional baggage (e.g., A, B, C, etc.), that does not mean that a person of ordinary skill in the art would be unable to understand what [backplate] mean[s] in the context of the entire patent."

*Ironburg Inventions Ltd. v. Collective Minds Gaming Co.*, No. 1:16-CV-4110-TWT, 2018 WL 2999615, at \*3 (N.D. Ga. June 15, 2018).

However, accepting Plaintiff's proposed definition is not ideal because it does not acknowledge that the "backplate" is characterized not solely by its position relative to the frontplate. If we were to adopt Plaintiff's definition, the backplate would not comprise "at least one set of electrical prongs including a hot prong, a neutral prong, and optionally a ground prong, positioned to correspond to a first receptacle of the wall outlet." '080 Patent 9:3-6 (Claim 19). The specification illustrates the requirement of the backplate as the component to which the electrical components are attached. "An integral aspect of this embodiment of the apparatus 10 of the invention is the electrical pins 18 and 28 and ground wire 19, which are bent at approximately a ninety degree angle with respect to the backplate component 14 and fastened to the backplate component 14 . . . ." '080 Patent 4:3–7. *See also id.* at 4:53–61 (describing as an "integral aspect" of the embodiment the connection of the electrical pins, through their respective plug prongs, to the respective wall outlet contacts, without exposing the electrical pins or wire, which are concealed under the backplate component).

Accordingly, the undersigned recommends that the Court construe "backplate" as "the component of the cover, opposing the front plate, that includes at least one set of electrical prongs."

### 3.  Hot Pin/Neutral Pin

The Parties submit the related terms of "hot pin" and "neutral pin." The limitation at issue reads: "an electrical cord extending from the backplate, or the cover, said cord comprising at the cords proximal end: at least one **hot pin**, at least one **neutral pin** . . . positioned on or fastened or attached to the backplate of the cover . . . the height of the **hot pin**, **neutral pin**, and any ground

wire is approximately the same or less than the thickness of the cord." '080 Patent at 9:7–20 (emphasis added).

In its Motion, Plaintiff advanced the proposed construction, "electrical contact between the hot [or neutral] wire and the hot [or neutral] prong." At the hearing, counsel offered a slight modification and proposed the construction as "a structure for making an electrical connection between the [hot/neutral] wire and the [hot/neutral] prong." Defendant advances: "mechanical system for making an electrical connection between the hot [or neutral] wire and the hot [or neutral] prong."[3] The crux of the Parties' dispute is whether the pin is a "structure" or a "mechanical system"; both Parties agree that it must make an electrical connection between the respective wire and prong.

In defense of its proposed construction, defense counsel explained at the hearing that a "pin" is actually the end of a wire; Defendant insists there is some unnamed device, left out of the claim, that actually connects a wire to the pin. In its Response to Plaintiff's Motion for Preliminary Injunction, Defendant argued that the "pin" is in fact a metal clamp, which Defendant argues is shown in the specification though identified in the claim as the "hot pin" and "neutral pin."

In support of Defendant's assertion that "pin" is limited to a connector utilizing a physical clasp, Defendant cites to Figure 5 and Figure 6 of the Specification, reproduced below.

---

[3] There is no dispute over the modifiers "hot" or "neutral;" both Parties agree that a person having ordinary skill in the art would understand that these terms refer to the direction of the current flow. *See* Expert Declaration of Matthew Spenko, (ECF No. 59-2 at ¶ 27).



FIG. 5

FIG. 6

As noted in the description of the drawings in the '080 Patent, Figure 5 is a view of the inside of the back plate of the preferred embodiment of the invention, "showing the electrical connection component having electrical pins bent at a ninety degree angle with respect to each of the two legs of each electrical pin." '080 Patent at 2:39–43. Figure 6 is a top view of the back plate of the preferred embodiment showing the electrical pins and the ground pin as they extend out of the backplate. *Id.* at 2:44–46.

"[A]lthough the specification often describes very specific embodiments of the invention," courts are "warned against confining the claims to those embodiments." *Phillips*, 415 F.3d at 1323. "In particular, [the Federal Circuit has] expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment." *Id.*; *Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Comm'n*, 383 F.3d 1352, 1366 (Fed. Cir. 2004) ("Even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." (quoting *Liebel-*

*Flarsheim Co.*, 358 F.3d at 906)).

Beyond Figures 5 and 6, Defendant does not cite to any language from the Patent Specification or the claim language that demonstrates an intention to limit the term "pin" to require a physical clasp. Indeed, the only restriction of a similar nature is found in Claim 1, that provides, "wherein the hot pin and the neutral pin are positioned at approximately right angles to the backplate." '080 Patent at 7:39–41.  Thus, "[w]hile [Defendant's] construction comports with the description of [the figures], it is improper to import limitations from the written descriptions or the drawings." *Cayago Americas, Inc. v. Heinen*, No. 21-CV-61035, 2022 WL 1308549, at *7 (S.D. Fla. Apr. 29, 2022), *report and recommendation adopted*, No. 21-CV-61035, 2022 WL 1605286 (S.D. Fla. May 20, 2022).

As noted by Plaintiff at the hearing, the summary of the invention supports that Claim 19 is not limited to pins with a physical clasp: "The electrical connection component ***in one embodiment*** has electrical pins bent at approximately ninety degree angle so that the connection of that component in the receptacle does not add bulk or cause the cover to extend significantly beyond the outer surface of the electrical wall outlet."  '080 Patent 2:1–20 (emphasis added).  And when referenced in the '080 Patent, the hot or neutral pins are referred to as "the electrical connection component" and the "conductive electrical pins." '080 Patent at 2:1–41; *id.* at 4:49–53.  This further supports that the defining characteristic of the pin is its conductive nature, rather than its embodiment as a physical clasp. Moreover, the Parties agree in their respective briefing that "[i]t is accepted in engineering to refer to the pin receiving current as the 'hot pin' and the pin returning current as the 'neutral pin.'" (ECF No. 22 at 16); (ECF No. 24 at 5). Thus, the Parties do not dispute that the function of the pin is to be an electrical connector between the wires from the cord to the electrical prongs.

Without further limiting language found either in the specification or the claim language, the undersigned does not find that "pin" solely refers to an electrical connection by means of a physical clasp. Rather, the construction advanced by Plaintiff at the hearing more accurately defines the term and ultimately the undersigned recommends that the term be construed as "a means for making an electrical connection between the [hot/neutral] wire and the [hot/neutral] prong."

### 4. Thickness of the Cord

The Parties submit this term for construction. Plaintiff proposes that the term should be defined as "the distance the cord extends between the frontplate and the backplate." Defendant advances "the height of the cord" as its construction.

Plaintiff's proposed definition, Defendant notes, is tethered to the cord's placement in the cover, and defines its dimension in terms of how much it separates the frontplate and the backplate of the cover. Defendant urges the Court that the thickness of the cord is an inherent trait, not dependent on its placement of the cord, and because the specification uses the terms height *or* thickness interchangeably, thickness here means height. On reply, Plaintiff explains that there is no practical difference between the Parties' proposed constructions.

This is not a term that requires construction. Merriam-Webster defines "thickness" as "the smallest of three dimensions; (length, width, and thickness)."[4] An integral aspect of the apparatus is that it is *thin*, "so thin as to avoid adding any significant bulk to the wall outlet, thereby enabling a user to position furniture in front of or adjacent to the outlet and essentially flush with, *i.e.*, less than about an inch away from the wall on which the outlet is located." '080 Patent 2:65–3:2. As

---

[4] *Thickness*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/thickness (last visited Sept. 9, 2024).

used in Claim 19, "thickness of the cord" describes the smallest of its three dimensions, *i.e.*, not width or length, but thickness.

### 5. Minimize the Distance

The Parties submit for construction the entire phrase "positioned on or fastened or attached to the backplate in such a manner as to minimize the distance between the frontplate and the backplate." The competing constructions proposed by the Parties, however, reveal that most of the words in the phrase should be afforded their plain and unmodified meaning; the Parties dispute only what it means to "minimize the distance." Plaintiff proposes that the Court construe the entire phrase as "positioning [the pins] in such a manner to avoid increasing the distance between the frontplate and the backplate significantly beyond the thickness of the cord." (ECF No. 71 at 9). Defendant proposes "positioning the pins and any ground wire to be equal to or less than the height of the cord." (ECF No. 70 at 15).

To review the contested term in context, Claim 19 requires "an electrical cord extending from the backplate, or the cover, said cord comprising at the cords proximal end: at least one hot pin, at least one neutral pin . . . positioned on or fastened or attached to the backplate in such a manner as to **minimize the distance** between the frontplate and the backplate . . . and wherein the height of the hot pin, neutral pin, and any ground wire is approximately the same or less than the thickness of the cord." '080 Patent at 9:7–20 (emphasis added). In Claim 19, "minimize the distance" must be read in the context of the entire claim, which also teaches that the height of the pins and ground wire are "approximately the same or less than" the thickness of the cord.

17

To "minimize" means to reduce or keep to a minimum;[5] a minimum is further defined as "the least quantity assignable, admissible, or possible."[6] Like "approximately," this relative term of degree tolerates some variance in the precise measurement, whether height or distance, of the electrical components as they are positioned on the backplate. However, its tolerance has a limit: the position of the electrical components cannot *minimize the distance* between frontplate and backplate if it exceeds the minimum distance resulting from the other component, here, the cord. Plaintiff's proposed construction would tolerate a variance in the distance between frontplate and backplate in a quantifiable direction that the patent expressly teaches away from.

The specification informs that "[t]he maximum distance between the backplate component 14 and the frontplate component 12 is approximately the height or thickness of the electrical cord 16 connected to or attached to the backplate component 14." '080 Patent at 3:56–59; *see also id.* at 4:35–42 ("Cover 15 is as thin as the thickness of the combination of the frontplate component 12 mounted on the backplate component 14 and the electrical pins 18 and 28, the ground wire 19, and electrical cord 16 in between the components 12 and 14. This combined thickness, or thinness, is less than about an inch and also is less than the thickness of a typical baseboard at the base of a wall in preferred embodiments."). Though the claim language of "minimize the distance" is a term of degree, it provides objective boundaries—the fixed thickness of the cord—"'for those of skill in the art' in the context of the invention to be definite." *See Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1349 (Fed. Cir. 2022).

The undersigned recommends that the Court construe the term "positioned on or fastened or attached to the backplate in such a manner as to minimize the distance between the frontplate

---

[5] *Minimize*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/minimize (last visited Sept. 9, 2024)
[6] *Minimum*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/minimum (last visited Sept. 9, 2024).

and the backplate" as "positioned so that the distance between the frontplate and backplate is no greater than the thickness of the cord."

### 6. Approximately the same or less than [the thickness of the cord]

The Parties submit this entire phrase for construction. Plaintiff urges the Court to apply the plain and ordinary meaning for the words "approximately the same or less than." Defendant advances "equal to or less than."  The contested term in context provides that "the height of the hot pin, neutral pin, and any ground wire is **approximately the same or less than the thickness of the cord**."  '080 Patent at 9:19–20 (emphasis added).

"Words of approximation . . . are descriptive terms commonly used in patent claims to avoid a strict numerical boundary to the specified parameter." *Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1310–11 (Fed. Cir. 2003) (internal quotations omitted); *Ferring B.V. v. Serenity Pharms., LLC*, No. 17 CIV. 9922 (CM), 2020 WL 1164700, at *2 n.1 (S.D.N.Y. Mar. 11, 2020) ("[T]erms of degree such as 'substantially,' 'about,' or 'closely approximate' do not necessarily render the claim indefinite, so long as the term provides enough certainty to one of skill in the art when read in the context of the invention." (internal quotations omitted)). "The term 'approximately' allows the patentee to avoid an otherwise 'strict 100%'" vertical boundary. *Focus Prod. Grp. Int'l, LLC v. Kartri Sales Co., Inc.*, No. 15 CIV. 10154 (PAE), 2018 WL 3773986, at *8 (S.D.N.Y. Aug. 9, 2018). Similar to the term "minimize the distance," approximately is a term of degree that is subject to the objective boundary of the fixed thickness of the cord. *See Niazi Licensing Corp.*, 30 F.4th at 1349.

At the hearing, Plaintiff's counsel argued that Defendant's proposed construction would read "approximately" out of the Claim. I disagree. By approximating the height of the electrical components taught in the Claim, the inventor avoided the necessity of precision in the equating

the height to the thickness of the cord; some variance is tolerated. But again, that tolerance is limited by the requirement that the electrical components' position not increase the distance between frontplate and backplate any more than is necessitated by the thickness of the cord.

Accordingly, the undersigned recommends that the Court construe this term as "approximately the same but not greater than" the thickness of the cord.

## IV.   CONCLUSION

A party shall serve and file written objections, if any, to this Report and Recommendations with the Honorable David S. Leibowitz, United States District Judge for the Southern District of Florida, on or before **September 17, 2024**. Failure to timely file objections will bar a de novo determination by the District Judge of anything in this recommendation and shall constitute a waiver of a party's "right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions."   11th Cir. R. 3-1 (2016); 28 U.S.C. § 636(b)(1)(C); *see also Harrigan v. Metro-Dade Police Dep't Station #4*, 977 F.3d 1185, 1191–92 (11th Cir. 2020).

**RESPECTFULLY SUBMITTED** in Chambers in Miami, Florida, this 9th day of September, 2024.

LAUREN F. LOUIS
UNITED STATES MAGISTRATE JUDGE